HIRE, AUDITOR OF ALLEN COUNTY, PLAINTIFF, *v.* BOARD OF COUNTY COMMISSIONERS OF ALLEN COUNTY, DEFENDANT.

Common Pleas Court, Allen County.

No. 46848.   Decided July 14, 1960.

*Mr. John R. Evans*, for plaintiff.

*Mr. Anthony J. Bowers*, for the Allen County Commissioners.

*Messrs. Bennett & Bennett*, for intervening petitioners.

DULL, J. This is an action for a declaratory judgment. The action was brought by the Auditor of Allen County, Ohio, as plaintiff with the Board of Commissioners of Allen County, Ohio, named as defendants (hereinafter referred to as the Commissioners). A taxpayer of Allen County, Ohio, filed his petition as an intervenor. The matter was heard on the pleadings, testimony and the evidence.

By a resolution adopted July 23, 1958, the Commissioners decided to submit the question of a bond issue to the electors. This resolution read in part: "BE IT RESOLVED, and hereby determined by the Board of County Commissioners of Allen County, Ohio, that it is necessary for the purpose of providing funds for the acquisition of land and equipment and the construction of facilities for a new north-south runway and the replacement of the existing East-West runway and the improvement of existing facilities of the Allen County Airport, to issue and sell SEVEN HUNDRED TWENTY-FIVE THOUSAND DOLLARS, ($725,000.00) of bonds of said County."

Then at the general election of November 4, 1958, there was submitted to the electors of Allen County this question of issuing bonds of the County "for the purpose of providing funds for the acquisition of land and equipment and the construction of facilities for a new north-south runway and the replacement of the existing east-west runway and the improvement of existing facilities of the Allen County airport, in the sum of Seven Hundred Twenty-Five Thousand Dollars ($725,-000.00)." At the election the bond issue carried by the requisite legal majority of 55%. Thereafter the Commissioners by resolution adopted January 15, 1960, authorized the issuance of the bonds "for the purpose of providing funds for the acquisition of land and equipment and the construction of facilities for a new north-south runway and the replacement of the existing East-West runway and the improvement of existing facilities of the Allen County Airport in the sum of Seven Hundred Twenty-Five Thousand Dollars ($725,000.00)."

The bonds were advertised and sold and are now outstanding having been paid for by the purchasers. The funds from the sale of the bonds have been deposited in the requisite bond fund

and have been invested in government securities pending their disbursement.

A resolution adopted by the Commissioners on January 15, 1960, provided that $165,000.00 of the proceeds of the bond issue were to be used for the acquisition of real estate or easements. This sum was to be matched by federal funds making approximately $330,000.00 available for the acquisition of a site. No attempt to appraise or acquire any real estate or easements at the site of the Lima Airport on Baty Road (Allentown Road) —the only existing airport facilities in Allen County, but privately owned except for a strip of land owned by Allen County —was made by the Commissioners until sometime after January 1, 1960, when the bonds were sold. The reason for this delay, according to the testimony, was the uncertainty as to the availability of matching federal funds until after that date. Thereafter, appraisals were made at the Baty Road site and negotiations for purchase were entered into with certain of the property owners. As a result of such proceedings, the appraised and estimated value of the 23 parcels of land it would be necessary to buy in fee simple was in excess of $500,000.00. No appraisals of the 26 flight easements for a "clear zone" it would be necessary to buy because of the dwellings located in the area were placed in evidence, although there were estimates in excess of $100,000.00. The costs of such easements would be an additional cost of land acquisition at the Baty Road site. A resolution adopted on May 27, 1960, by the Commissioners abandoned the Baty Road site because of the excessive cost of land acquisition and proposed a site in Perry Township for the airport. This resolution contained this statement: Due to the reluctance of land owners to sell at a price that would enable the County Commissioners to proceed with an Allen County Airport at the Allentown Road Site the Airport Advisory Committee recommends to the County Commissioners that they exercise the option and acquire land for the proposed Perry Township Site No. 4, said site being shown on Plat and Airport Survey, dated April 15, 1958, by the Engineering Firm of Clyde Williams and Associates, Indianapolis, Indiana.

"It was further moved that, if all technical data is in order and that if the engineering firm of Clyde Williams and Asso-

ciates will terminate the present agreement on the Allentown Road site in a fair and equitable settlement to the satisfaction of the County Commissioners, that they be further engaged for the engineering at the proposed Perry Township site.'' Options have been obtained on the necessary acreage for the location of the airport at the Perry Township site which, if timely exercised, would enable the Commissioners to stay within the allocated sum of $330,000.00 ($165,000.00 from bond issue proceeds plus $165,000.00 from matching federal funds) for land acquisition. A zoning certificate permitting construction of an airport has been obtained from Perry Township. Further, the Perry Township site located in an area of farm land and requiring the removal of only one tar paper shack for a ''clear zone'' has the tentative approval of the federal authorities for use as an airport. However, the Baty Road site has had definite approval by the federal authorities for use as an airport and a so called Master Plan has been prepared for it. Matching federal funds are now available for the construction of an airport in Allen County, Ohio.

The key question presented by these proceedings is: Do the Allen County Commissioners have the power to use the proceeds of the bond issue to locate the proposed airport at a site other than the Baty Road Site?

The language contained in the resolution of the Commissioners of July 23, 1958, the ballot submitted to the voters of Allen County in the election of November 4, 1958, and the resolution of the Commissioners of January 15, 1960, are practically the same. This language clearly indicates that the proposed airport was to be located at the Baty Road site and nowhere else. Further, according to the testimony, in the promotion and publicity relative to the bond issue campaign prior to the election of November 4, 1958, the Baty Road site was the only one stressed either directly or by implication. It was not until May 27, 1960, that by resolution of the County Commissioners that the Baty Road site was abandoned and a new site proposed in Perry Township. A map of six possible airport sites had been prepared prior to the passage of the bond issue of 1958.

The powers of the Commissioners are contained in Section 307.20, Revised Code:

"The board of county commissioners, in addition to its other powers, shall have the same authority, subject to the same limitations, with respect to airports, landing fields, and other air navigations facilities as is conferred upon municipal corporations by Sections 719.01 and 717.01, Revised Code."

Section 719.01, Revised Code, provides in part:

"Any municipal corporation may appropriate, enter upon, and hold real estate within its corporate limits:

(O) For establishing airports, landing fields, or other air navigation facilities, either within or without the limits of a municipal corporation for aircraft and transportation terminals, with power to impose restrictions on any part thereof and leasing such part thereof as is desired for purposes associated with or incident to such airports, landing fields, or other air navigation facilities and transportation terminals, including the right to appropriate a right of way for highways, electric, steam, and interurban railroads leading from such airport or landing field to the main highways or the main line of such steam, electric, or interurban railroads, as are desired; all of which are hereby declared to be public purposes.

Division (O) of this section does not authorize a municipal corporation to take or disturb property or facilities belonging to any public utility or to a common carrier engaged in interstate commerce, which property or facilities are required for the proper and convenient operation of such utility or carrier, unless provision is made for the restoration, relocation, or duplication of such property or facilities elsewhere, at the sole cost of the municipal corporation."

Section 717.01, Revised Code, provides in part:

"Each municipal corporation may:

(V) Acquire by purchase, gift, devise, bequest, lease, condemnation proceedings, or otherwise, real or personal property, and thereon and thereof to establish, construct, enlarge, improve, equip, maintain and operate airports, landing fields, or other air navigation facilities, either within or without the limits of a municpal corporaton, and acquire by purchase, gift, devise, lease, or condemnation proceedings rights of way for connections with highways, waterways, and electric, steam, and interurban railroads, and improve and equip such facilities

with structures necessary or appropriate for such purposes; no municipal corporation may take or disturb property or facilities belonging to any public utility or to a common carrier engaged in interstate commerce, which property or facilities are required for the proper and convenient operation of such utility or carrier, unless provision is made for the restoration, relocation, or duplication of such property or facilities elsewhere at the sole cost of the municipal corporation."

Section 133.10, Revised Code, provides:

"The resolution provided for in Section 133.09, Revised Code, shall relate only to one purpose. 'One purpose' includes, in the case of a county or township, any number of roads, highways, bridges, and viaducts; in the case of a municipal corporation, any number of streets, bridges, and viaducts, including the municipal corporation's share in streets to be improved in part by assessment; in the case of a school district, any number of school buildings; and in any case, all expenditures, including the acquisition of a site and purchase of equipment, for any one utility, building, or other structure, or group of buildings or structures for the same general purpose, or for one or more roads, highways, bridges, and viaducts included in the same resolution."

Further, Section 133.36, Revised Code, provides in part:

"The money from the principal, on the sale of such bonds or notes, shall be credited to the fund on account of which the bonds or notes are issued and sold and used only for the purpose set out in the resolution or ordinance of the taxing authority."

The provisions of Sections 719.01 and 717.01, Revised Code, both contain limitations on the exercise of the powers of the Commissioners relative to public utilities and common carriers engaged in interstate commerce.

However, according to the testimony of representatives of certain telephone, oil and gas companies which had lines in, under or over certain portions of the proposed Perry Township site, such companies were willing to cooperate with the Commissioners in the restoration, relocation or duplication of their property or facilities.

But, bearing in mind the language of Sections 133.10 and

133.36, Revised Code, what was the one purpose set out in the resolutions and the ballot?

The primary purpose for which the proceeds of the bond issue were to be used is for the construction of an airport. There is little or no dispute about this. But, to repeat the pivotal question, is it for the construction of an airport at the Baty Road site and at no other?

There is a paucity of decisions directly in point. But there are cases where a similar question was presented relative to the actions of different legislative bodies.

The syllabus of *State, ex rel. Clarke et al., v. Board of Education*, Volume 11 Ohio App., 146 (May 26, 1919), states:

"1. Section 7620, General Code, vests in boards of education the power to select school sites; and in the absence of abuse of discretion, fraud, or collusion, the exercise of such power will not be interfered with by a reviewing court.

2. The recital in a resolution of a board of education of a rural school district that a certain village was the most suitable locality for a school site, and the representations made by such board at the time a bond issue was submitted to the electors, can not limit the power of such board to later exercise its discretion and change the location of the site to meet the then needs of the school district."

Syllabus 2 of *State, ex rel. Van Harlingen v. Board of Education*, Volume 104, Ohio St., 360 (March 14, 1922) states: "Boards of education are by the provisions of Section 7625, General Code, vested with authority to determine the needs of school districts for the proper accommodation of the schools, and the approval by the electors at an election called for that purpose of a bond issue to raise funds for the erection of a schoolhouse does not withdraw from the board the discretion and authority conferred upon it by law, nor require the board to proceed with the erection of a particular school building." At page 364 of the opinion, the court states further: "It will be observed that Section 7625, General Code, requires the board to "submit to the electors of the district the question of the issuing of bonds for the amount so estimated."

The manifest purpose of the legislature was to secure to the electors of the district the final determination of the matter of

the issuing of bonds to be paid by the taxpayers of the district. There is nothing in the section which indicates that the legislature intended to withdraw from the board of education the discretion conferred upon it by that and other sections of the Code with reference to the control and management of the schools of the district, or with reference to the consolidation of rural districts. All of those matters are left within the discretion of the Board precisely as if the question of the bond issue had not been submitted to the electors. Therefore it cannot be said that after the approval of the bond issue by the electors there was "specially enjoined upon the board of education as a duty resulting from their office, trust or station" the obligation to proceed with the erection of a school building upon any site, or at all, or to do any other special thing connected with their duties as such board."

The syllabus of *Kreig* v. *City of Springfield*, Volume 92, Ohio App., 436 (May 31, 1952) states:

"1. Where the purpose of a bond issue approved by the electors of a municipality is stated to be the elimination of two grade crossings and there are insufficient funds to proceed with both projects, it lies within the sound discretion of the legislative body of such municipality to decide whether to proceed with one project.

"2. In such case, where the nature of the improvement was not included in the proposal submitted to the electors, it lies within the sound discretion of the legislative body whether such grade crossing shall be eliminated by an 'underpass,' and 'overhead' or a 'bypass.' "

The syllabus of *Bartlett* v. *Board of Education*, Volume 71, Ohio Law Abs., 140 (CP July 21, 1955) states:

"1. Boards of Education have authority and discretion over the location, number and nature of elementary school buildings and a Board of Education is not restricted by a bond levy, the express purpose of which was to acquire a site and construct "an elementary school building and additions to existing school buildings," to the construction of the single school provided for by such bond issue, but may, where the circumstances warrant, in an exercise of its sound discretion, con-

struct two elementary schools out of the proceeds of such bonds."

A recent (May 5, 1960) Common Pleas Court case, *Bearden v. Shaker Heights*, Volume 83, Ohio Law Abs., 314 (Ohio BAR, issue of May 27, 1960), in its syllabus states:

"1. The fact that prior to the submission of a bond issue for the purpose of building a swimming pool the city polled the area to be served to determine how many persons would be interested in using such pool on a subscription basis and later circulated literature that indicated that while a tax increase was not anticipated such increase was possible as a result of the issuance of said bonds, was not such a misrepresentation as to void the bond issue where the ballot whereby such bond issue was presented to the people clearly indicated a levy of taxes outside the 10-mill limit was required.

"2. A municipality cannot be held responsible for statements made by independent political organizations relating to a proposed bond issue.

"3. Each voter knows when he goes to the polls the issue that he is voting on is the issue which is presented on the ballot, and in the language of the ballot, and that no statement made by any individual or official can change that language.

"4. A ballot which recites that the bonds shall be issued for the purpose of 'improving recreation facilities by constructing swimming pools and other fireproof structures and play areas and otherwise developing the sites therefore' does not violate the one purpose rule, since it authorizes the building of structures and play areas only in conjunction with the swimming pools so as to form a single whole.

"5. The fact that a resolution provides for more than one swimming pool does not express a multiple purpose."

Other cases just as relatively in point are: *Rogers et al., Taxpayers v. City of Cincinnati*, Volume 10, Ohio App., 238 (December 30, 1918); *Sheffield Lake v. Holley, Mayor et al.*, Volume 152 Ohio St., 374 (October 26, 1959) (see also Editor's Note in Volume 40, Ohio Opinions, 444).

Still other cases not so relatively in point but still pertinent are: *State, ex rel. Speeth et al., v. Carney, Auditor*, Volume

163, Ohio St., at page 184 and 185 (April 20, 1955); *State, ex rel Board of Education,* v. *Thompson, Clerk et al.,* Volume 167 Ohio St., at pages 27 and 28 (November 6, 1957); *Brooklyn Plaza, Inc.* v. *Brooklyn,* Volume 83, Ohio Law Abs., 89 (November 19, 1959).

Further, in Volume 14, Ohio Jurisprudence 2d, page 242, is found the following pertinent language: "The courts are not endowed with visitorial powers to approve or disapprove the manner in which county commissioners exercise the powers conferred upon them. They cannot reach or control them in this regard unless in some manner the commissioners have brought themselves within their judicial cognizance. So long as the commissioners act honestly and in good faith, and keep within the limits of the powers given them by the law, the courts have no authority to interfere with or control their legitimate discretion. In other words, courts have no power to substitute their own opinion or discretion for that of the commissioners in respect to matters which the law has placed within the control of the latter."

After careful consideration this court takes the same position relative to the County Commissioners as the court in *Brannon et al* v. *Board of Education,* Volume 99 Ohio St., at pages 373 and 374 (April 29, 1919), took relative to the Board of Education: "A court has no authority to control the discretion vested in a board of education by the statutes of this state, or to substitute its judgment for the judgment of such board, upon any question it is authorized by law to determine. Nor will a court restrain such board of education from carrying into effect its determination of any question within its jurisdiction, except for an abuse of discretion, or for fraud and collusion on the part of such board in the exercise of its statutory authority."

Therefore, it is the opinion, ruling, order and judgment of this court:

(1) That there has been no abuse of discretion and there is no evidence of fraud or collusion in any of the actions or proceedings of the Board of County Commissioners of Allen County, Ohio, relative to submission of the question of a bond issue to the electors for the purpose of providing funds for the

construction of an airport in Allen County and their decision to use the funds provided by such bonds for the construction of an airport at the Perry Township site instead of the site on Baty Road, inasmuch as the one purpose of such bond issue was to provide funds for the construction of an airport in Allen County, Ohio;

(2) That the Auditor of Allen County, Ohio, may expend the funds provided by such bonds for the construction of an airport for Allen County at the Perry Township Site;

(3) Costs of these proceedings are assessed against the Board of County Commissioners of Allen County, Ohio.

While still air-borne and before finally touching down, the court feels constrained to make several observations. Public officials should never underestimate the intelligence of the electorate and its alertness to the needs for civic progress. And, for the most part, people respect public officials and the discretion they must exercise. In presenting the question of the bond issue and in the subsequent resolutions of the Commissioners how much better it would have been to have used plain and simple language to the effect that funds were needed and would be used for the construction of an airport in Allen County, Ohio, and then stopped. Then much of the ensuing difficulties and the present litigation might have been avoided and an adequate airport for Allen County much closer to realization.

As Emerson in his essay on POLITICS so nicely puts it: "But the wise know that foolish legislation is a rope of sand, which perishes in the twisting; that the State must follow, and not lead the character and progress of the citizen; the strongest usurper is quickly got rid of; and they only who build on Ideas, build for eternity; and that the form of government which prevails is the expression of what cultivation exists in the population which permits it. The law is only a memorandum."

However, this court's position relative to an airport for Allen County, Ohio, is the same as that of the Justice Cardozo, when as a member of the New York Court of Appeals, in upholding the power of the City of Utica to issue bonds payable from tax funds for the development of an airport, said in *Hesse*

v. *Rath et al.*, Volume 164, Northeastern Reporter 342 (December 7, 1928):

"We think the purpose to be served is both public and municipal. A city acts for city purposes when it builds a dock or a bridge or a street or a subway. Its purpose is not different when it builds an airport. Aviation is today an established method of transportation. The future, even the near future will make it still more general. The city that is without the foresight to build the ports for the new traffic may soon be left behind in the race of competition. Chalcedon was called the city of the blind because its founders rejected the nobler site of Byzantium lying at their feet. The need for vision of the future in the governance of cities has not lessened with the years. The dweller within the gates, even more than the stranger from afar, will pay the price of blindness."